# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DENNIS E. JONES-EL,

        Plaintiff,

v.                                              Case No. 07-C-0504

WILLIAM POLLARD, PETER ERICKSEN,
MARK LESATZ, KEVIN POSTL,
RICK RAEMISCH, and DAN WESTFIELD,

        Defendants.

## DECISION AND ORDER

This case concerns the constitutional right of a prison inmate to receive mail. Plaintiff, Dennis E. Jones-El, filed this *pro se* civil rights complaint alleging that various officials at Green Bay Correctional Institution ("GBCI") violated his rights under the First Amendment by interfering with his incoming mail. Jones-El claims that the defendants have a policy of using exaggerated security concerns to deliberately suppress speech with which they disagree or which is unfavorable to the defendants and the Department of Corrections. Jones-El also claims that the defendants enforced this "suppression policy" against him in retaliation for his past and continued exercise of his constitutional rights. Before me now are the parties' cross-motions for summary judgment. For the reasons that follow, the defendants' motion will be granted and Jones-El's motion will be denied.

## BACKGROUND

Plaintiff Dennis E. Jones-El, who is also known as Mustafa-El K. A. Ajala, was convicted of a crime and sentenced by a state judge to the custody and control of the Wisconsin Department

of Corrections ("DOC"). Between May 10, 2005, and February 9, 2007, Jones-El was an inmate at GBCI. He is currently housed at the Wisconsin Secure Program Facility ("WSPF"). The defendants named by Jones-El include various officers and employees of the DOC, most of whom work at GBCI. William Pollard is the warden of GBCI, and Peter Ericksen is the GBCI Security Director. Mark Lesatz is a GBCI Supervising Officer 2, with a working title of Captain, and Kevin Postl is a GBCI Correctional Sergeant. Daniel Westfield is the Security Chief for the DOC, Division of Adult Institutions, and Rick Raemisch is the DOC Secretary.

The DOC has promulgated a regulation governing inmate mail. As relevant to this case, the regulation provides that the department may refuse delivery of mail to an inmate if it "is 'injurious'", meaning that it:

* * *

b. Poses a threat to the security, orderly operation, discipline or safety of the institution.

c. Is inconsistent with or poses a threat to the safety, treatment or rehabilitative goals of an inmate.

Wis. Adm. Code § DOC 309.04(4)(c)8. Delivery may also be refused of mail that "[i]s determined by the warden, for reasons other than those listed in this paragraph, to be inappropriate for distribution throughout the institution." § DOC 309.04(4)12. If delivery of incoming mail is denied, a written notice stating why the letter was not delivered is sent to the sender, and the inmate to whom the mail was sent is given a written notice that the letter was not delivered and the identity of the sender. The inmate may then appeal the denial to the warden, who then decides whether the denial was proper. § DOC 309.04(4)(e) and (f).

On January 12, 2006, Sergeant Postl was working in the GBCI mail room and opened a piece of mail that was addressed to Jones-El from an inmate at WSPF. Postl rejected the mail for

2

delivery, and a "Notice of Non-Delivery of Mail," form DOC-243, was sent to Jones-El. Captain Lesatz later reviewed the rejected piece of mail and determined that it did not violate any tenet of the code and should not have been rejected. At Lesatz's direction, Sergeant Postl delivered the piece of mail to Jones-El on or about February 17, 2006.

Sergeant Postl was again working in the GBCI mail room on May 1, 2006, when he opened mail sent to Jones-El from P. Sawn, of Blue River, Wisconsin. Postl rejected the piece of mail and completed a "Notice of Non-Delivery of Mail," which was sent to Jones-El. The mail was rejected because it contained court documents and medical records for another inmate and thus was considered third-party mail. On or about May 10, 2006, Postl opened a piece of mail sent to Jones-El by an inmate at Columbia Correctional Institution ("CCI") that contained court papers about the other inmate. Postl rejected the mail for delivery because he deemed it third party mail and sent a "Notice of Non-Delivery of Mail" to Jones-El. On May 14, 2006, Jones-El signed the Disposition of Non-Delivered Item(s) boxes of both forms and returned them to the mail room. Jones-El requested that both pieces of mail be sent out of the institution, and Postl authorized charges to Jones-El's account on May 16, 2006, to return the mail to P. Swan and the inmate at CCI.

Sergeant Postl also rejected mail sent to Jones-El by Diane Block of Cross Plains, Wisconsin on five separate dates in 2006.[1] On June 28, 2006, Postl rejected a piece of mail containing court files for another inmate. On July 6, 2006, Postl rejected five separate pieces of mail, which included court records of another inmate and copies of an article authored by Jones-El under the name

---

[1] Jones-El was allowed to proceed on a claim related to the denial of mail six times in June and July 2003. However, it appears from the evidence before me that these events actually occurred in 2006. On July 3, 2003, Jones-El resided at the Wisconsin Secure Program Facility, not GBCI. Additionally, Jones-El did not dispute the defendants' proposed findings of fact regarding the incident, which indicate that it occurred in 2006, rather than in 2003.

3

Mustafa-El Ajala, entitled *Who Says Wisconsin Doesn't Have the Death Penalty?*. The article was published in the May 22, 2006 edition of The Prison Action Coalition's newsletter THE NEW ABOLITIONIST. On August 8, 2006, Sergeant Postl rejected mail from Diane Block that consisted of three copies of the article. On September 28, 2006, Postl rejected mail that contained five copies of Jones-El's article and, on November 15, 2006, the rejected mail consisted of six copies of the article. Each time, the mail did not contain the entire PAC newsletter, only Jones-El's typed version of his article.

The parties have filed cross-motions for summary judgment. The defendants argue that they are entitled to summary judgment because: (1) the denial of delivery of Jones-El's article was reasonably related to legitimate penological objectives; (2) the denial of delivery of third-party mail was reasonably related to legitimate penological objectives; (3) there is no evidence that Jones-El's litigation activities were a motivating factor behind the non-delivery of his mail and the mail he was denied was not protected speech in a prison environment; and (4) they are entitled to qualified immunity.

Jones-El opposes the defendants' motion and instead submits that he is entitled to summary judgment. He asserts that there are no genuine issues of material fact and that the evidence shows that the defendants violated his right to freedom of speech, freedom of press and to join with others to petition the government. Jones-El also contends that there exist no genuine issues as to any material fact that the defendants retaliated against Jones-El due to his protected speech.

**DISCUSSION**

**A. Summary Judgment Standard**

Pursuant to Fed. R. Civ. P. 56(c), "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

4

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Id.* Once the moving party has demonstrated the absence of a genuine issue of material fact, the burden shifts to the non-moving party to show that there is a genuine dispute as to the material facts of the case. *Id.* at 323-24. The responding party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

**B. Constitutional Standard For Withholding Inmate Mail**

Prison inmates have a First Amendment right both to send and receive mail. *Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005). That right, however, is not without limitations. The Supreme Court has long recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). "In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Prisoner challenges to prison restrictions alleged to violate First Amendment rights are therefore

5

"analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Id.*

The Supreme Court first addressed restrictions on inmate mail in *Procunier v. Martinez*, 416 U.S. 396 (1974). In *Martinez* the Court held that for restrictions on inmate mail to satisfy the First Amendment, they must meet two criteria:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

Id. at 413-14. Applying these criteria to the case before it, the *Martinez* Court found invalid state prison regulations that authorized censorship of mail containing statements that "unduly complain" or "magnify grievances," or expressions of "inflammatory political, racial, religious or other views," and matter deemed "defamatory" or "otherwise inappropriate." *Id.* at 415. The Court concluded that the prison authorities had "failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression." *Id.*

*Martinez* was overruled, however, or at least limited, in *Thornburgh v. Abbott*, where the Court was called upon to review the constitutionality of regulations promulgated by the Federal Bureau of Prisons which generally authorized the warden to reject a publication sent to an inmate "if it is determined detrimental to the security, good order, or discipline of the institution or if it

6

might facilitate criminal activity." 490 U.S. 401, 404 (1989) (quoting 28 C.F.R. § 540.71(b)). In *Thornburgh* the Supreme Court retreated from any suggestion it had left in *Martinez* that the decisions of prison officials in this area would be subjected to a "strict or 'least restrictive means' test." 490 U.S. at 411. Instead, *Thornburgh* adopted the more deferential reasonableness standard that in *Turner v. Safely*, 482 U.S. 78 (1987), the Court had found more fitting for the decisions of prison administrators in general. 490 U.S. at 413-14.

*Turner* held that restrictive prison regulations are permissible if they are "'reasonably related' to legitimate penological interests," 482 U.S. at 87. *Turner* also set forth four factors it found were "relevant in determining the reasonableness of the regulation at issue." *Id.* at 89. As restated in question form by the Supreme Court in *Beard v. Banks*, they include:

> First, is there a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it? Second, are there alternative means of exercising the right that remain open to prison inmates? Third, what impact will accommodation of the asserted constitutional right . . . have on guards and other inmates, and on the allocation of prison resources generally? And, fourth, are ready alternatives for furthering the governmental interest available?

548 U.S. 521, 529 (2006) (internal quotations and citations omitted). It is under this standard upon consideration of these questions that Jones-El's claims must be evaluated.

## C. Denial of Jones-El's Article

On four dates in 2006, Jones-El was denied delivery of multiple copies of an article he authored that were sent to him from an individual outside the prison system. The article entitled *Who Says Wisconsin Doesn't Have the Death Penalty?* appeared in the Prison Action Coalition's May 22, 2006 newsletter, THE NEW ABOLITIONIST, which the DOC had banned throughout its correctional institutions. Jones-El contends that he requested the copies so that he could send them

7

to a variety of other newspapers in the hope that the article would be further published. He claims that the defendants' refusal to deliver the copies of his article to him violated his First Amendment rights to free speech, freedom of the press and to petition the government.

The theme of Jones-El's article is that, although Wisconsin does not have a law authorizing the use of the death penalty, the conditions of confinement to which the state's prisoners are subjected are so harsh that many prisoners commit suicide, resulting in a de facto death penalty for relatively minor offenses. The article cites a DOC report that states suicides are committed by Wisconsin inmates at a rate nearly twice the national average. It then describes how inmate John Virgin, a personal friend of Jones-El with only fifteen months remaining on a two-year sentence, hung himself on April 7, 2006, after being placed in the segregation unit at GBCI. The article describes the harsh conditions of segregation as "23-24 hour cell confinement, limited communication, sleep deprivation (cells illuminated 24 hrs. a day), loss of property (t.v., radio, books, etc.), no-contact visits, denial of food, clothing and running water, among other similarly atypical hardships." (Aff. of Dianne K. Block, Ex. D.) Jones-El claims in his article that Wisconsin inmates are placed in segregation for more trivial reasons and for longer periods of time than are inmates in other states. He also claims that a high proportion of those housed in segregation suffer from mental illnesses that are exacerbated by the harsh conditions. Jones-El attributes the harsh conditions to which Wisconsin inmates are subjected to misguided policies of the DOC that encouraged construction of more "high-tech, expensive, and draconian" control segregation units and the previously so-called "Supermax" prison, instead of additional space for the general population. Once the high-tech segregation units and Supermax prison were built, the DOC then needed to utilize them whether or not the behavior of the inmates warranted such severe conditions. Toward the end of his article, Jones-El notes:

8

> Punishment for crime is supposed to be loss of liberty, not humanity, and not a
> person's sanity. It is clear that this problem with WI.'s prisons has grown lethal,
> making it impossible for some prisoners to survive within the system and obviously
> not capable of surviving outside it. However. "The human question is not how
> many can possibly survive within the system, but what kind of existence is possible
> for those who do survive.?" — Dune. For the proponents of the death penalty the
> message should be clear: Before worrying about instituting a <u>new</u> death penalty, try
> fixing the one you already have.

*Id.* He then closes by offering his condolences to the family of his friend "and each family of those

slain here on WI.'s psychological death row" and by asking: "Can anybody out there hear me? WI.

definitely has a death penalty because they are literally killing us in here." *Id.*

As I previously noted in a decision upholding prison censorship of publications containing

this and similar articles, "no one would seriously argue that the government could, consistent with

the First Amendment, deny a free citizen either of the publications described above." *West v.

Endicott*, No. 06-C-763, 2008 WL 906225, * 12 (E.D. Wis. March 31, 2008). As in that case,

however, the issue before the court is not whether government can censor such publications for the

general public. Clearly, it cannot. The question before the Court is whether state prison officials

may constitutionally refuse delivery of copies of the article described above to a prisoner serving

a sentence in a maximum security prison as punishment for a serious crime. Under *Turner*, the

prison officials were acting properly and no violation of constitutional rights occurred if their refusal

to deliver the article was reasonably related to a legitimate penological interest. Moreover, in

deciding whether the decision of the defendants meets this test, I must accord them significant

deference. *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001) ("[B]ecause the 'problems of prisons in

America are complex and intractable,' and because courts are particularly 'ill equipped' to deal with

9

these problems, we generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge.") (quoting *Martinez*, 416 U.S. at 404-405).

The defendants contend that their refusal to deliver to Jones-El mail containing multiple copies of his article was reasonably related to substantial institutional concerns. Security Chief Westfield avers that a number of the statements in Jones-El's article "are problematic in a prison environment because not only do they contain several falsities, but they are also inflammatory and encourage disrespect on the part of inmates for the DOC rehabilitative programming and for the correctional staff running the programs." (Dkt. # 66, Aff. of Daniel A. Westfield ¶ 15.) Such statements, Westfield states, "encourage feelings of hopelessness and [a sense] that inmates' problematic behaviors are not the reasons they are in prison, but because it is an unjust and unfair system." (*Id.* at ¶ 16.) They also "call into question the legitimacy of the system of justice that has imprisoned inmates, DOC's system of maintaining control and discipline of inmates, and the guards who are responsible for controlling their behavior." (*Id.*) Westfield notes that articles such as Jones-El's "encourage distrust of correctional staff and unrest among inmates, which endangers the security and safety of the correctional institution, staff and the community." (*Id.* ¶ 19.) Jones-El's article, according to Westfield, "erroneously suggests that inmates are placed with DOC correctional institutions and segregation as a result of some sort of conspiracy by DOC and/or other politicians, and inmates are helpless and lack any control over the loss of all basic human necessities." (*Id.*) Such an article, according to Westfield, also encourages paranoia, especially in inmates with mental illnesses, and a sense of danger and victimization "which may result in acting out, group resistance, and violent self-help remedies by inmates against staff." (*Id.* at ¶ 20.) Further, because many of the statements in the article relate to GBCI, where Jones-El was housed at the time, the statements in

10

the article "only further legitimize[ ] GBCI inmates' feelings of hopelessness, anger, victimization, and helplessness. Such feelings can ignite inmates who are already in a volatile setting and who have been assigned maximum security due to their problematic and dangerous behaviors." (*Id.* at ¶ 21.)

The interests cited by the defendants to support their decision denying Jones-El multiple copies of his article, i.e., maintaining security, safety of staff, and rehabilitation of inmates, are undoubtedly "legitimate penological interests." *Turner*, 482 U.S. at 87; *Martinez*, 416 U.S. at 413. The crucial question is whether the defendants' refusal to deliver to Jones-El copies of his article was reasonably related to any or all of them. In view of the substantial deference that must be afforded state prison officials, I conclude it was. Before explaining precisely why I reach this conclusion, however, it is first necessary to note the different considerations that come into play when prison officials are dealing with incoming, as opposed to outgoing, mail.

In *Thornburgh* the Court noted that "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." 490 U.S. at 413. Outgoing mail, the Court observed, unless it touches on matters such as escape plans, plans relating to ongoing criminal activity, or threats of blackmail or extortion, poses little if any danger to the security of the institution. *Thornburgh*, however, dealt with "incoming publications, material requested by an individual inmate but targeted to a general audience." Once in the prison, such material "reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Id.* at 412. "In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder." *Id.* at 413.

11

Thus, in *West v. Endicott*, *supra*, this Court held that prison officials at the Wisconsin Secure Program Facility, formerly "Supermax", had not violated an inmate's First Amendment rights by refusing to deliver to him copies of several prisoner newsletters, including the very issue of THE NEW ABOLITIONIST in which Jones-El's article appeared. The newsletters contained other articles with such titles as *Life Within A Box; Institutional Insanity; Equal Justice? Drugs, race, and some pretty skewed numbers;* and *Just Take Those Shackles Off So I Can Tie My Shoes.* In general, the articles decried the harsh conditions of the state's prisons and suggested that many inmates were political prisoners forced to live under the supervision of guards who "protect their job security by touting the dangerousness of prisoners, and by claiming that prisoners cannot be rehabilitated." 2008 WL 906225 at *11. The authors of THE NEW ABOLITIONIST described their mission as "the abolition of prisons; more than that, we seek the abolition of the systems of oppression that create the need for prisons; we seek the abolition of police who are enforcers of the systems of oppression that create the need for prisons; we seek the abolition of capitalism as a system that divides us, destroys our environment, and commodifies all things." *Id.* at *13 (quoting January 2005 issue of THE NEW ABOLITIONIST). In one of the issues before the Court in *West*, the editors described what they called the Prison Industrial Complex:

> We see the Prison Industrial Complex as the epitome of oppressive, racist, and violent behavior by the State. Prisons now suffer the hubris of over-extension that leads to collapse. They are so vile and repulsive that even the thick-headed, violence-prone American public will eventually understand that this police state will also eventually target them. In reading the history of State sponsored punishment, it was the over-zealous public torturing that eventually turned the public against the King. When the State too openly displays its power, people get nervous.

*Id.* at *14 (quoting November 2005 issue of THE NEW ABOLITIONIST). Another issue contained a hagiographic article about George Jackson, founder of the Black Guerilla Family, a Marxist prison

12

gang.  Jackson was killed in a failed attempt to escape from the California State Prison at San Quentin in 1971 after someone smuggled in a gun.  Three prison guards and two other prisoners were also killed in the resulting shoot-out.  *Id.* at *13, n.13.

Based on my review of these and other articles which I described in more detail in *West*, I concluded the defendants' decision to deny the various publications there at issue was reasonably related to the legitimate goal of rehabilitating inmates, but even more importantly, to the need to maintain order and discipline so as to insure the security of the institution and the safety of the prison staff and the inmate population.  I explained:

> The claim that there are "haves" and "have-nots," and that the distinction is based on race, is nothing new, and one expects that many inmates share that belief and discuss it frequently.  The same is true of the other views expressed in the newsletters.  But the issue here is whether the institution must allow inmates to receive publications from the outside that potentially feed the anger and resentment that such beliefs would naturally engender by providing outside support for them that could then circulate among the prison population.  The articles, if believed, seriously undermine the moral authority of the prison and its staff to perform their jobs.  Why should one [obey] unjust and racist jailers?  The message conveyed by such articles also undermines rehabilitative efforts by the prison.  Why change if the cards are stacked against you and the powerful are intent on keeping you down?  Why do you even need to change if you are an innocent victim of an oppressive system?  These are not messages that the warden is required to allow into the prison in the form of publications offered to a general audience.  Add to this the noble battle cry of a fallen Native American chief, and one can readily understand the concern of those who must work in the prison.  In the context of a maximum security prison populated by inmates, some of whom may well believe that their imprisonment is not unlike the plight of Native Americans, it was not unreasonable for the defendants to take the position that phrases advocating fighting or dying in battle could lead to disruptions and impact prison security.

*Id.* at *15.

13

This case, of course, involves only a single article (albeit multiple copies) from one of the many prison newsletters that were before me in *West*.[2] Most of the statistics the article cites appear to be from the DOC itself, and there is no express call for violence or revolt. The concerns it raises over conditions in segregation units and general overcrowding, as well as its criticism of DOC policy, are not unlike what one reads in mainstream newspapers and even some judicial opinions. *See, e.g., Gillis v. Litscher*, 468 F.3d 488 (7th Cir. 2006) (comparing conditions of behavior modification plan imposed on plaintiff to "a soviet gulag"). Moreover, Jones-El is the author of the article. In light of these facts, Jones-El argues that the defendants' decision to withhold from him copies of his article has no relation to any legitimate interest of the correctional institution.

The fact that Jones-El is the author of the article, however, is immaterial to the question of whether the defendants' decision was reasonable. It is the content of the incoming publication that determines whether it poses a threat to a legitimate interest of the correctional facility such that the refusal of prison officials to deliver it to an inmate is reasonable. *Thornburgh*, 490 U.S. 415-16. Given the content of Jones-El's article, and notwithstanding the fact that it cites some statistics that appear accurate and contains criticisms that are shared by many on the outside of prisons, I conclude that the decision did not violate Jones-El's First Amendment rights. The decision was reasonably related to the institution's legitimate interest in maintaining discipline and order so as to insure the overall security of the institution and the safety of the staff and inmate population.

---

[2]Although Jones-El's article appeared in the May 22, 2006 issue of THE NEW ABOLITIONIST newsletter, the issue containing it was erroneously referred to as the June 20, 2006 issue in *West*. Initially, the defendants had not furnished the court with a copy, but they supplemented the record with it after my initial decision. I upheld the ban on this issue, as well, in a brief decision issued on August 22, 2008. *See West v. Endicott*, 2008 WL 3992772 (E.D. Wis.).

14

As noted above, the theme of Jones-El's article is that the Wisconsin DOC, through its officers and employees, is imposing a death penalty on inmates sentenced to prison, despite that fact the death penalty was abolished in the State more than 150 years ago. *See* Alexander T. Pendleton & Blaine R. Renfert, *A Brief History of Wisconsin's Death Penalty*, Wisconsin Lawyer (Jan. 2003). It is clear from his article that Jones-El intends more than mere metaphor. Although the subject of the article is the high rate of suicide among inmates placed in segregation, certainly a significant cause for concern, the tone Jones-El uses suggests that driving inmates to take their own lives is a known consequence of policies the DOC has deliberately chosen for its own selfish and bureaucratic reasons. After quoting DOC Mental Health Director Kevin Kallas' comment that the DOC recognizes that being placed in segregation "can lead to more mental health issues," for example, the article states: "There is clearly no lack of awareness of the debilitating and lethal effects of WI.'s segregation units, especially GBCI." (Aff. of Dianne K. Block, Ex. D.) The article later continues with an explanation for why the state built its Supermax prison: "It was simply a part of the prison industry's evolution into a self-serving machine and placing its profit interest over the state's penological interests and prisoner's well-being." (*Id.*) Finally, his closing reference to his "slain" friend and claim that "they are literally killing us" make clear that he is accusing the DOC and its employees of extreme cruelty bordering on, if not amounting to, murder.

Though the message is not as direct as the publications described in *West*, the essential message is the same: that inmates at GBCI are victims of gross injustice, the conditions in which they are held are inhumane, and the DOC has adopted a policy the known consequence of which is to kill them. I conclude that Security Chief Westfield's concern that such statements are "problematic in a prison environment" because "they encourage disrespect on the part of inmates

15

for the DOC rehabilitative programming and for the correctional staff running the programs" is

reasonable. (Westfield Aff. ¶ 15.) As I concluded in *West*, such statements

> call into question the legitimacy of the of the system of justice that has imprisoned [the inmates] and, thus, the authority of the guards who are responsible for controlling their behavior. Such views, which are no doubt already held by many prisoners, can, if fanned by publications that appear to offer empirical support, undermine the order and discipline that are essential to maintain security within the institution. At least it is not unreasonable for prison officials to so conclude.

2008 WL 906225 at *12.

Jones-El vigorously disputes Westfield's assertion that articles such as his lead to a sense

of hopelessness on the part of inmates which can undermine rehabilitation efforts and result in

serious behavior problems. He argues that Westfield offers nothing more than speculation to

support his assertion and cites his own experience as an inmate for more than eighteen years as

evidence that in fact, it is the attempt by prison officials to suppress articles such as his that leads

to hopelessness and despair. He notes that his own efforts culminated in *Jones-El v. Berge*, 164 F.

Supp.2d 1096 (W.D. Wis. 2001), a case that mandated significant changes in the treatment of

mentally ill inmates at Wisconsin's Supermax prison. Rather than adversely affecting inmate

morale, Jones-El argues that efforts such as his give inmates hope and a sense that they can be

heard; that they have a voice that others can hear so that redress is possible. (Dkt. # 85, Br. In Opp.

at 6.)

The idea that free and open debate is essential for a healthy citizenry is, of course,

fundamental to the nation. *See Johnson v. Raemisch*, 557 F. Supp.2d 964, 969 (W.D. Wis. 2008)

("The history of the United States is in many ways a history of voicing dissent."). But a prison is

not democratic republic. The nation's prisons are not appropriate places to encourage debate over

16

issues that call into question the legitimacy of the authority of prison officials over the prisoners sentenced to their custody. Jones-El's argument that suppressing articles such as his does more harm than good may have some merit. Yet, the same is true of Security Chief Westfield's argument that publications such as his undermine the authority of correctional officers, and thereby threaten the security of the prison and make rehabilitation more difficult. Neither position has clear empirical support, which is not surprising given the fact that each raises questions concerning willed human behavior, a subject that does not readily lend itself to study by empirical methods. That does not mean that Security Chief Westfield's assertions are entirely "speculative," however, or that they can be disregarded. *Thornburgh* requires only that a prison official's decision to exclude a publication be reasonably related to legitimate penological interests, not that the prison offer empirical proof that allowing the material into the institution will necessarily result in harm. 490 U.S. at 417 ("We agree that it is rational for the Bureau to exclude materials that, although not necessarily "likely" to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time."). Here, I conclude that the concerns expressed by Security Chief Westfield over many of the statements contained in Jones-El's article are reasonable.

The fact that much of the article may not have been objectionable does not change the result. *Thornburgh* expressly rejected the argument that as a reasonable alternative to rejecting the entire publication prison officials should simply tear out those portions that give rise to the institution's concern. It held that the district court's finding in that case that "tearing out the rejected portions and admitting the rest of the publication would create more discontent than the current practice was 'reasonably founded.'" 490 U.S. at 418-19. The Court also held that the "administrative

17

inconvenience" of such an alternative to the "all-or-nothing" rule provided additional support for the conclusion that the prison officials were not obligated to adopt it. *Id.* at 419.

Jones-El contends that it was not his intent to spread his article around the institution, but instead to send copies to other publishers in the hope that they too would publish it so that it would receive a wider audience. He argues that the defendants are suppressing his right to express grievances in a public forum. (Dkt. # 85, Br. in Opp. at 3.) Somewhat inconsistently, Jones-El also contends that he intended to have other inmates join with him in petitioning the legislature for reform. (*Id.* at 9.) He argues that the defendants' actions violated his "freedom to associate to promote and advance common beliefs and ideas." (*Id.*)

To be sure, prison officials may not censor outgoing inmate mail that criticizes the conditions of their confinement or the policies or practices of correctional officers. The Court held in *Martinez* that regulations that "authorized censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, religious or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate'" were unconstitutional. 416 U.S. at 415. While *Thornburgh* reversed this holding to the extent it applied to publications coming into the institution, it reaffirmed *Martinez*'s limitation on outgoing mail. *Thornburgh*, 490 U.S. at 413 ("Furthermore, we acknowledge today that the logic of our analyses in *Martinez* and *Turner* requires that Martinez be limited to regulations concerning outgoing correspondence."). It is clear here, however, that the defendants did not prevent Jones-El from sending his article out of the institution; he submitted it for publication and it was in fact published in THE NEW ABOLITIONIST. It was when Jones-El attempted to have copies of the article sent into the institution that the defendants intervened. Based on *Thornburgh*, their actions were not improper. Correctional officers are not

18

required to accept an inmate's assurance that a publication they have reasonably deemed a danger to institutional order and security will not be disseminated to other inmates. Moreover, if in fact Jones-El truly wanted to offer his article to a wider group of publishers, there was no reason he could not have designated one of his friends and supporters on the outside as his literary agent and had them mail the article directly to other newspapers.

As to Jones-El's argument that the defendants' actions violated his "freedom to associate to promote and advance common beliefs and ideas," I note that prisoners do not retain a general right of assembly. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977) (holding that bans on inmate solicitation and group meetings were rationally related to reasonable objectives of prison administration); *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) ("[A]s our cases have established, freedom of association is among the rights least compatible with incarceration."). Moreover, any right that may exist "to promote and advance common beliefs and ideas" does not override reasonable security concerns of the prison, and Jones-El's article was not in the form of a petition in any event.

As to Jones-El's concern over inmates despairing over not being heard, it is worth noting that preventing the dissemination of inflammatory publications within the prison does not prevent inmates from voicing complaints to legislators or the public, or bringing suit to redress violations of their rights. There has been no showing that Jones-el has been prevented from writing to anyone he desires on the outside of the institution, and in this district alone he has filed ten separate lawsuits since 1996. Obviously, he has also filed actions in the Western District of Wisconsin. I therefore conclude that the defendants' actions satisfy the other *Turner* factors as well. Not only were the actions of the defendants in refusing to deliver multiple copies of Jones-El's article reasonably

19

related to legitimate penological interests, but Jones-El had other means of exercising his rights. For the defendants, there were no lesser alternatives readily available that would not adversely impact the prison.

I recognize that Jones-El's argument to the contrary relies heavily on *Johnson v. Raemisch*, in which Judge Crabb held that DOC officials had violated an inmate's First Amendment rights in refusing to deliver to him the March 2007 issue of THE NEW ABOLITIONIST. Like the article at issue here, the March 2007 issue that prison officials had refused to deliver in *Johnson* was critical of DOC officials (". . . when it comes to the imbecilic totalitarian decisions made by the parole board & the PRC personnel staff in prison who are clueless as to what they are doing, or are they?", 557 F. Supp. 2d at 967) and complained of the unjust treatment of inmates ("The purpose of this letter is to show the deceiving and manipulative tactics which are fabricated stories by PRC at RGCI [Red Granite Correctional Institution] is using to keep us longer than possible...." *id.* at 968). In rejecting DOC's argument that its refusal to deliver the publication was reasonably related to the same institutional security and inmate rehabilitation concerns raised here, Judge Crabb wrote:

> Even under the deferential standard of *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), defendants' censorship of the newsletter cannot survive scrutiny. Many of defendants' reasons for denying plaintiff the newsletter suggest that it was the critical nature of the newsletter that prompted the decision rather than any true interest in security or rehabilitation. Even if defendants' concerns were genuine, their justifications amount to nothing more than "because we said so," which is not enough to pass constitutional muster. Any other conclusion would threaten the right of prisoners to criticize government officials, a result that cannot be squared with the First Amendment.

*Id.* at 965. Judge Crabb also noted that most of the statements to which the defendants objected were contained in commentary that was critical of Wisconsin prisons and the state's parole practices, and that the remaining statements were calls to action, asking readers and their friends and

20

family to get politically involved. *Id.* at 972. The court concluded that "[t]o the extent that defendants censored the newsletter to suppress these views, their reasons are not valid." *Id.*

The outcome in *Johnson*, of course, is not dispositive in this case. This is true not only because one district court's decision, even a decision by a district judge as learned and highly respected as Judge Crabb, is not binding on another district court, but also because the material at issue in *Johnson* is not the same as the article in this case. However, even though the articles at issue in *Johnson* are arguably less inflammatory and disrespectful of the DOC personnel and correctional officers than Jones-El's article, they are not so clearly so that the two results can be easily reconciled. Judge Crabb has likewise recognized the conflict between her decision in *Johnson* and this Court's in *West*. *See Van Den Bosch v. Raemisch*, Case No. 09-CV-62, 2009 WL 4663134, *3 ("If two district courts in the same state come to different conclusions despite reviewing the same law, it is difficult to argue that prison officials were 'plainly incompetent' for failing to realize that they may have been violating plaintiff's constitutional rights."). Clearly, this is an area where the Seventh Circuit, and perhaps even the Supreme Court, will be asked to provide further guidance. Having carefully considered the principles set out by the Court in *Turner* and *Thornburgh*, however, and the arguments on both sides of the issue, I conclude for the reasons set forth that the defendants did not violate Jones-El's rights in refusing to deliver copies of his article. I now turn to the remaining claims.

**D.  Denial of Third-Party Mail**

Jones-El has also challenged the denial of other items of mail he received in 2006. The first incident was a piece of mail that was received on January 12, 2006. It was initially denied apparently because Sergeant Postl thought it contained third party information, but Captain Lesatz

21

later determined it did not. The mail was sent by WSPF inmate Cedric Robinson, but concerned legal work for WSPF inmate Maurice Fort-Greer. (Aff. of Catherine Francois, Ex. 1002.) However, it also included an envelope addressed to Jones-El from Fort-Greer and correspondence from Fort-Greer requesting Jones-El's assistance on legal matters. (Dkt. # 65, Lesatz Aff. ¶¶ 39-41.) Although delivery was initially denied, Jones-El received the mail approximately one month later. I cannot conclude that this isolated incident, almost four months prior to the other denials of mail at issue in this case, violated Jones-El's constitutional rights, especially since the denial was overturned as part of the prison's review process such that Jones-El received the mail approximately one month later. Isolated mail errors do not constitute a First Amendment violation. *See Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).

The other denials, which occurred on May 1, 2006, May 10, 2006, June 28, 2006 and July 6, 2006, were because the mail included court documents and medical records regarding other inmates. Captain Lesatz averred that GBCI does not allow third-party mail, which he defines to include any mail sent to a particular inmate from a third-party (either another inmate or a person outside of the institution) regarding another inmate. All such mail is rejected for delivery. (Dkt. # 65, Lesatz Aff. ¶ 27.) Defendants submit that these denials were all properly rejected third-party mail.

Underlying the third-party mail policy is the concern that some inmates attempt to gather information about other inmates' crimes and convictions through the use of information, including court databases, that are available to the public. According to defendant Lesatz:

> The gathering and distribution of this type of information on other inmates and staff can be detrimental to the safety and security of the institution and poses a threat to the specific inmate(s) and staff that

22

the information pertains to, and threatens the security, orderly operation, discipline and safety of the institution. For example, inmates who have been convicted of sex-related crimes, and particularly sexual predators and other crimes against children can be the target of inmate retribution. Once this information falls into the hands of an inmate, it can be quickly disbursed throughout the inmate population, and these individuals could be targeted for physical and/or mental harm, including retribution, financial coercion or forcible sex acts, and could pose a threat to the security and safety of all inmates and staff.

(Dkt. #65, Lesatz Aff. ¶ 30.) Additionally, court documents can identify victims, acquaintances, gang ties or other types of information that fuel threats, violence, and gang activities in prison. Inmates also use third-party mail to make it more difficult for DOC staff to track illegal activities such as payment for services, legal work, etc., because inmates are not allowed to exchange money or barter services.

Jones-El contends that the defendants' reasons for limiting third-party mail are mere speculation and conjecture, and are unfounded. He suggests that the defendants "list a host of imagined threats to the possession of legal documents, court papers, public records, available right in their own law libraries and newspapers in the general library." (Dkt. # 85, Pl.'s Br. In Opp. at 14.) Jones-El maintains that these denials were "simply one person mailing legal files (not messages, written notes, letters, etc.) from someone else." (*Id.* at 13.) He argues that the defendants' assertion that third-party mail is any mail from one person to another "regarding" a third person is not substantiated by any rule and that such a policy would result in prisoners being prohibited from even mentioning anyone other than the person he's writing to and vice versa for the person writing him. (*Id.*) The defendants counter that inmates may correspond with each other regarding legal matters, but they are only allowed to correspond directly with each other and not through a "third-party" (either another inmate or a person on the outside).

23

It should be noted at the outset that inmates do not have constitutional protection to provide legal assistance to fellow inmates beyond what is normally accorded prisoners' speech under the First Amendment. *See Shaw v. Murphy*, 532 U.S. at 225 ("In this case, we are asked to decide whether prisoners possess a First Amendment right to provide legal assistance that enhances the protections otherwise available under *Turner*. We hold that they do not.").[3] Moreover, the fact that DOC regulations and policies do not specifically apply is of no moment in a federal civil rights action. The question here is whether the defendants conduct violated rights guaranteed by the United States Constitution or other federal law, not whether it was consistent with DOC regulations and policies. *See Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]his court has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.'") (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir.2003)). It thus follows that Jones-El's third-party mail claims likewise rise or fall on the *Turner* analysis.

As discussed above, security is undoubtedly a legitimate interest in prisons. *Thornburgh*, 490 U.S. at 417. Based on the explanation provided by Captain Lesatz, I conclude that the prohibition on third-party mail has a reasonable relationship to the safety and security of the institution. *See Turner*, 482 U.S. at 87. Although it may be true, as Jones-El argues, that much of the information that inmates may pass on about other inmates may be available through on-line data

---

[3]Notwithstanding *Shaw*, and apparently in response to Jones-El's complaints, the GBCI established a separate procedure for inmates to exchange documents and information outside of the normal mail system through the use of inmate-to-inmate legal routing. The written policy adopting the policy became effective September 28, 2008. (Dkt. # 65, Lesatz Aff. ¶¶ 23, 28, Ex. 1014.) It is unclear whether the policy was in effect at the time relevant to Jones-El's claims here, however, and it does not apply to correspondence from inmates at other institutions.

24

bases accessible from the prison library, much more is not. Police reports, statements of confidential informants, sentencing transcripts, medical records, and similar materials, all capable of being used in ways inimical to institutional security, are generally not readily available. Prohibiting mail that contains records or documents concerning other inmates may not guarantee that information dangerous to other inmates does not become available, but it clearly offers some protection. It thus satisfies the first *Turner* consideration.

The remaining *Turner* factors are also satisfied. The rule does not prohibit inmates from obtaining legal assistance from other inmates. Inmates seeking legal assistance are free to correspond directly with Jones-El or any other inmate from whom they seek assistance. Allowing the kind of third-party mail Captain Lesatz describes would increase the risk to guards and other inmates because of an increase in intimidation, retribution and violence, as well as the threat of gang activity and the power imbalance that results from inmates exchanging money and/or bartering for services. And requiring correctional officers to carefully read and consider each document concerning another inmate that one inmate tries to pass on to another in order to make an individualized determination whether the third-party mail was for a proper purpose would only add to the administrative burden under which prison staffs already work. For all of these reasons, I conclude that the restriction on third-party mail that resulted in the denial of mail on four occasions in 2006 did not violate Jones-El's First Amendment rights.

**E. Retaliation**

Finally, Jones-El alleges that the defendants' actions in withholding his mail were motivated not by legitimate concerns for institutional security and or other proper institutional interests, but by a desire to retaliate against him for writing an article critical of, and embarrassing to, GBCI and

the DOC. Additionally, or alternatively, Jones-El alleges that the defendants were retaliating against him because of his successful litigation against the DOC. The defendants, on the other hand, submit that they are entitled to summary judgment on this claim because there is no evidence that Jones-El's authorship of the article or his litigation activities were a motivating factor behind the non-delivery of his mail.

Although I have already concluded that the defendants' refusal to deliver Jones-El's mail did not violate his First Amendment rights, that conclusion is not dispositive of his retaliation claim. A prison official who takes action in retaliation for a prisoner's exercise of a constitutional right may be liable to the prisoner for damages. *Backbock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). Even otherwise lawful action "taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Although it is easy to state a retaliation claim, *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) (petitioner need not allege a chronology of events from which retaliation could be plausibly inferred), the burden of proving the claim is heavy, *Babcock*, 102 F.3d at 275.

There is no doubt that the conduct Jones-El engaged in that he alleges motivated the defendants' actions is constitutionally protected. Prisoners have a constitutional right of access to the courts, and thus Jones-El's previous litigation is constitutionally protected. *See Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996) ("If a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access to the courts, he has a claim under § 1983."). And as noted above, his conduct in writing an article critical of the DOC and GBCI and sending it out for publication is protected by the First Amendment. *See also Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009) ("[W]e conclude that a prisoner's speech can be

26

protected even when it does not involve a matter of public concern."). It therefore follows that if the defendants' actions were motivated by either, his retaliation claim should proceed.

It is not enough, however, simply to allege retaliation if an inmate plaintiff is to defeat a motion for summary judgment. He must come forward with some evidence that the defendants' actual motivation was retaliatory. *Salas v. Wisc. Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir.2007). Here, Jones-El offers none. Not surprisingly, Jones-El offers no evidence that any of the defendants ever mentioned or referred to his having written the article or his previous litigation as a reason for refusing to deliver his mail. Retaliating officials seldom admit the real but improper reason for their actions. But one would expect evidence that other inmates were treated differently by the defendants. In other words, if the defendants were retaliating against Jones-El because of his constitutionally protected conduct, one would expect that other inmates who had not antagonized them in the same manner would have been allowed to receive mail containing publications such as Jones-El's article, or third party mail of the kind described by Captain Lesatz. Jones-El offers no evidence that this occurred. In other words, he offers no evidence that the rules were different for other inmates.

The evidence offered by the defendants, on the other hand, indicates that other inmates were treated the same. The newsletter containing his article was banned in all of the correctional institutions under DOC's control. It wasn't that just Jones-El was not allowed to receive such articles in the mail; no inmate was, unless a court ordered otherwise. Likewise with respect to the policy on third-party mail, Jones-El has produced no evidence that mail sent to other inmates containing records or documents about an inmate other than the sender was delivered. Captain Lesatz's affidavit describes a policy he followed for all inmate mail, not just Jones-El's. This hardly shows a retaliatory motive.

Plaintiffs in retaliation cases frequently point to suspicious timing as evidence of a retaliatory motive. *See Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006); *Culver v. Gorman & Co.*, 416 F.3d 540, 545-50 (7th Cir. 2005). However, "[s]peculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000). Moreover, Jones-El's litigation activity has been ongoing and almost continuous for years. Does this mean that every action prison officials take that he finds burdensome is to be presumed retaliatory? To hold that the mere timing of the non-delivery constitutes evidence of retaliation would permit such a claim on every action by prison officials that Jones-El dislikes.

In this case, Jones-El has not established that his protected speech was a motivating factor in the denial of his mail in 2006. He has only the timing of the publication of his own article, but the evidence shows the publication containing it was banned throughout Wisconsin prisons, not just to him. The defendants have offered reasonable non-retaliatory explanations for their conduct, and Jones-El has offered no evidence to rebut them. "It is well-settled that conclusory allegations . . . without support in the record do not create a triable issue of fact." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998). Summary judgment will therefore be granted on this claim as well. And because I conclude the defendants did not violate any of Jones-El's rights, there is no need to address their defense of qualified immunity.[4]

---

[4]While the motions for summary judgment were being briefed, Jones-El filed an expedited motion for extension of time to file reply brief. However, the next day, the court received a letter from Jones-El indicating that he would not be filing a reply brief, as well as Jones-El's reply to the defendants proposed findings of fact. This motion is therefore denied as moot.

## CONCLUSION

In sum, I conclude that the defendants failure to deliver to Jones-El copies of his previously published article and mail containing documents and records concerning inmates other than the sender was reasonably related to legitimate concerns of the prison. The defendants' actions therefore were not in violation of Jones-El's First Amendment rights. I also conclude that Jones-El has come forward with no evidence that their actions were retaliatory for constitutionally protected conduct. The defendants' motion for summary judgment is therefore **granted**, and Jones-El's motion for summary judgment is **denied**. The Clerk is directed to enter judgment in favor of the defendants dismissing the plaintiff's claims with prejudice.

**So Ordered** this __2nd__ day of February, 2010.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

29